24-1045CV American GreenFuels Rockwood et al. v AIK Chuan Construction PTE et al. I understand we have Mr. Hagan for the appellant, and you would like to reserve two minutes for rebuttal? That's correct, John. Okay, so Mr. Hagan, whenever you're ready. Good morning, Your Honors. My name is John Hagan. A little under the weather, so I apologize. I'm here on behalf of Appellant AIK Chuan. As I'm sure the Court is aware, there are four issues that we've raised on appeal that we believe the resolution of should require either the reversal in whole or in part of the judgment below. But I'd like to focus on the second one first that we raised because I think it's the most important one from a precedential standpoint. I realize this is a precedent-setting court. And that is with respect to whether a secured lender, such as AGF or Comar in this case, can avoid the rigorous requirements of Article 9 of the UCC imposed on the disposition of secured collateral and as memorialized in an Article 9 security agreement under the guise of local or state real estate law. And let me explain briefly what the district court here did on that issue. The district court below here held that AGF, as secured creditor, could sell off an entire green diesel plant full of machinery and equipment, and all subject to Article 9 security agreements. And that included groundbreaking technology that would use reactors to turn wood chips into diesel fuel. And they could sell all of that off by putting an ad in the local newspaper that read- It's not just because they put the ad in the paper. It's also because they sold it along with the land, right? That's correct. So deny that if you're selling real property, the UCC does not apply. You look to the state law, right? Well, there are exceptions. You're right that the UCC Article 9 does not apply to real property. However, there are exceptions to that. And under the Article 9, it says except in the case that there is a provision for a security agreement. And that's precisely what the deed of trust, which the parties have shortened to say the deed of trust, but that document is actually really a deed of trust and a security agreement. The deed of trust estate included the land as well as all the personal property connected to the land, right? Because it gave them interest in everything that's also on the land, right? Right. And so it said that when you would have a sale of the deed of trust estate, you would proceed under Tennessee law, right? Tennessee law, correct, Your Honor. And even Tennessee's version of the UCC says that when you have a sale of real property along with personal property, you proceed under the law applicable to the real property, right? There's actually an election under- Well, there's an election between having a sale of the personal property separate from the real property, in which case you'd proceed under the UCC and then Tennessee law to a real property. But if you do them together, doesn't the Tennessee UCC say you're supposed to proceed under the law applicable to the real property? What the provision says is that the secured creditor may proceed, and it is an either or. And that is to say whether they're electing to proceed under Article 9 without prejudice to the real estate, which can be part of the same process or separate, as I read it, or just as to the real property. The facts of this case are- Say that again? Yeah, that you can either, there's an election, so it's an either or. You can proceed as to Article 9- For only the personal property. Right, or you could bundle them under the statute because- Okay, and then what? Right, and then- If you do that, then what? Then if you do that, you can either sell the equipment and machinery separately- No, no, no, you said if you bundle them. I want you to finish the sentence then. If you bundle them, then what?  If you bundle them, then you have to comply with both. And that could have been easily done here. We submit- Well, it does not say that, right? Because the law says the secured party may proceed, one, under this part as to the personal property without prejudicing any rights with respect to the real property, or two, as to both the personal property and the real property in accordance with the rights with respect to the real property, in which case the other provisions of this part, meaning the UCC, do not apply, right? Right. So you don't deny that it's at least possible, maybe we can talk about whether there's a certain election here that you think makes a difference, but it's at least possible to sell the real property along with the personal property under the law applicable only to the real property. Unless, based on the facts that matter, though, Your Honor, and here we have that it was advertised as both a foreclosure because the deed of trust dictates the real property and a UCC sale. That's the way it was published to the public. And the reason is- Yeah, I get it. Well, Your Honor, there's also a separate security agreement relating to the equipment and machinery that's part of the financial documents, and the district court below never explained how that is irrelevant in terms of the disposition of the capital. Well, what I just read, doesn't that explain it? If you were just selling the collateral, that is the personal property, you would proceed under the UCC. But if you're selling it along with the land, the real property, you proceed under the law applicable to the real property. Your Honor, it is our position that 9604 cannot mean that if a secure lender has a specific security agreement as to valuable machinery and happens to also own the land, which is maybe one one-hundredth of the value, and it's both in the- there's actually a security provision in the deed of trust, section 4.01, creates a security agreement within the deed of trust, and there's a separate security agreement. We do not believe, and this is why it's so critical for precedent, that the secure creditor could just list it with the coordinates. Remember, there's no discussion of even the land here, that there's anything on the land. There's no description that there's any machinery at all. It's a coordinates. Well, that's only in the local county newspaper ad advertising the sale, right? But we do have record evidence that they reached out to other potential buyers who might be interested in buying the plant, right? There are certainly some suggestions- Any of those buyers who want to buy a diesel fuel plant are reading the local county times, whatever that newspaper was- And, Your Honor, that's precisely the point. Under Article 9, it requires a very rigorous process to find the right market, to find the right buyers who might be interested in this, to actively market it. If you look at these cases, talking to a few people, you know, that they happen to know, sort of, you know, informally, is not enough. Something that they happen to know, wasn't it? Like five very sophisticated buyers and then H1 as well as power, smart power, what's it called, smart power? Oh, proton power. Proton power, sorry. Yes, PPI, yes. We're at the sale, right? Right, and that's certainly true, Your Honor, but my point is broader than that, which is if you look at the case law, talking to two or three individuals or their presence of a couple of different people who potentially know something about it is not enough. You have to look to the given industry and market it to the proper- What should they have done? Well, I think what they should have probably done is hire- There's a bunch of things they could have done. We contend that they should have marketed it as a going concern. Now, there's other things they could have done, but in any event, what Article 9 says is to every piece of collateral, any piece of collateral- That's a separate question. I mean it seems odd to market it as a going concern if it never actually was operating, right? But regardless, even if they did market it as a going concern, would it be sufficient to reach out to the potential buyers to which they did in fact reach out? No, because you have to market it more broadly than that. The oil and gas industry is a national and international business here, and if you look at the cases interpreting what the rigorous requirements for Article 9 secured lender are in terms of marketing, the secured collateral, they're extensive and rigorous. And also, just stepping back, even if Article 9 didn't apply, what they did here- I've seen a lot of foreclosure ads. If they have property on them, if they have a building, I've never seen it not mention that or at least have a picture of it. We contend that- We've heard your argument. You've reserved two minutes for rebuttal. Sure. Why don't we hear from counsel for the ability- Sure. Thank you. Good morning. Good morning. Jack Thomas on behalf of the appellees, Comar Americas and American Green Fuels. And I'm just going to ask you to, again, just maybe tilt the microphones a little to you just so we can capture it for the recording. Very well. Thank you. I said this in the closing. I'm going to say it again. We ought not be here, but we are an appeal which we view as an affront to intellectual honesty. This is a black and white case involving very sophisticated parties who entered into incredibly well-crafted, interrelated contracts that deal conclusively, including the issue which was just talked about, with every issue in the case. With facts so overwhelming, Judge Cote used the words undisputed and beyond doubt more than once. But the reason we're here is Eichshwein just didn't want to pay. They signed the subordination agreement. That's the thing that locks them into taking over the loan, never contemplating clearly that a global would be unable to do- Counsel, I think we get the general gist. I think we're more interested in them eating potatoes. So, for example- Fine. The first eight minutes were taken by your opponent talking about Article 9. We're here to decide legal issues, so why don't you talk about why he's wrong? All right. Very well. So, it's really, again, it's the contract. So, you look to the deed of trust to determine the governing law, and that is what was foreclosed on. And that is something that Eichshwein was aware of because Corporate Counsel for Global informed Global and then Eichshwein that it was the deed of trust that was being foreclosed on, and that it was governed by Tennessee law. And then as- Well, if the security agreement says that the collateral is subject to the UCC, I mean, shouldn't we take account of that as well? The security agreement covers the collateral of each and every one of the global entities, including their other assets and their stock. The deed of trust is very specific to the global entity that was the operator and owner of this facility, which was not a groundbreaking technology greenfield plant. It was an idea to try to make something work that had never been tried and has never been proven to work since. So, it was a nice idea. It just didn't work. But it was the deed of trust that was foreclosed on. The deed of trust covers the land and the personal property on the land. It's very clear in it. But the personal property, I mean, the plant and all of the equipment is also collateral, right? Yes. So you don't deny that if you were selling the collateral but not the land, you would proceed under the UCC, right? I believe that would probably be correct, but we foreclosed on both. Isn't it kind of odd that just because of the happenstance that you own the land but actually the plant is really the more relevant thing, you get to ignore the security agreement that says that the collateral is governed by the UCC? The two go together. I mean it's very specific. The deed of trust incorporates the provisions of the security agreement. But it was the deed of trust. It's not just that it incorporates it, right? You're saying it overrides it because if you were focused on the collateral by itself, then the security agreement would say that the sale has to be governed by the UCC. But because you're also including the land, which nobody really thinks is the most important part of this property, you get to ignore the UCC application to the collateral. Well, the deed of trust makes clear that you foreclosed on the – I mean it is the document that is – was designed to provide the remedy of foreclosure should there be a breach and a failure to assume a loan. So that was the document that was foreclosed on. As I said, it covers both. And under Tennessee law, it's very clear that – and you talked about it before. If the agreement covers both personal and real property, the secured party may proceed under this part with respect to the personal property without prejudicing the rights with respect to the real property. Or two, if it's asked to both, the real property in accordance with the rights – I know. I'm familiar with that. I read that to opposing counsel. But one point that he makes is that you can make an election, and so it is true that in the announcement of the sale, you did call it a UCC sale. So was that an election to apply the UCC to at least part of the sale? No, it was not. It was – So why did you do that? Why is that in the title? I think it's simply because the sale was going to cover both land and personal property. But you have to follow Tennessee law. And the last part of that provision I was about to read is when you proceed with respect to real property as to both, which you are allowed to do under Tennessee, then the rest of the provisions of the UCC don't apply. So then you just go to what does Tennessee law require? And as Judge Cote very clearly found, our client complied with Tennessee law to the letter. The notice was appropriate according to Tennessee law. The publication went out just as it should three times. It checked off all the bases that were required in order for this foreclosure sale to happen. There's a fiction here that this thing was more than it was. I mean the background is these folks – Well, I don't know. I mean the plant wasn't working the way they envisioned, but it did work. It's just that there were technical issues and tarring and so on that you had to overcome to get the fuel to generate in the sufficient quantity, right? No, it didn't work. Okay, so the idea was you could take wood chips and put them into this machine and magically at the end of the process – Well, hyperbole doesn't help. I don't think there was a suggestion that it was going to be magic, right? I mean there are all sorts of startups that just don't pan out, right? Somebody has a concept and it can't be commercialized or something. So again, the hyperbole is not particularly helpful. I mean when you said a thing like magically they're going to come out, we have a limited amount of time here. I mean I get it if you're saying, look, there was a concept. They tried to implement it and it just didn't work. I get that. That must happen all the time in the world. So let's just get down to brass tacks. I think it's – you're dealing not with a jury here but with the judges. Let me use a different word. It was a very complicated scientific process that was supposed to turn wood chips into on-spec diesel. There's no dispute that the wood chips could go into this machine and it would spit out a crude product from which you could – But it wasn't usable. It wasn't usable. But wouldn't the plant still have some kind of value even if you used it to produce biochar or one of the other products that it could generate? I mean there's some value to the plant, isn't there? I would say no. The entire idea behind this entire plant from the beginning was this fantastic opportunity to potentially produce very valuable on-spec diesel fuel. Biochar is a byproduct. I think it's used for fertilizer. I was going to say nobody would actually just operate the plant to produce the biochar. It was never the idea by anybody. I have that argument. Can I just ask about the interest rate? So the subordination agreement says that upon an event of default, American Green Fuels sends a default notice to H1. And the default notice shall include an accounting of the outstanding amount of indebtedness under the financing documents as of such date, meaning the date of the notice. And that's the definition of the term outstanding indebtedness. And then it says the subordinated creditor will assume the financing documents from the lender, and the lender agrees it will assign the financing documents to the subordinated creditor in exchange for cash consideration in the amount of the outstanding indebtedness which is previously defined. So doesn't that mean that under the subordination agreement, what happens is H1 pays the outstanding indebtedness as of the date of the notice of default, and the exchange gets the financing documents, and then it basically steps into the shoes of American Green Fuels, right? That's what was supposed to happen. Right. So the 25% default rate, that applies to the debtor, right? So that's global energy. So under what – I just don't see where in the subordination agreement it would say that the 25% default rate applies to the subordinated creditor who ends up in the shoes of the debtor as of the date of default. The subordination agreement is very clear. You assume the outstanding indebtedness as defined in the financing documents, which include, among others, the loan agreement, the deed of trust, and the security agreement. So you look to the loan agreement. The loan agreement has a different definition of outstanding indebtedness because the subordination agreement says the default notice shall include an accounting of the outstanding amount of the indebtedness under the financing documents as of such date. And then it puts in parentheses to indicate that this is the definition of the term, the outstanding indebtedness. So isn't the definition under the subordination agreement the amount of the indebtedness under the financing documents as of the date of notice of default? Right, but you have to look then to the financing documents to determine what that amount is. Right, but I get that. Right. But they've only agreed to pay the indebtedness as of the date of default. There's no provision that says that then they accumulate interest if they refuse to assume the financing documents or anything else. There's nothing in the subordination agreement that says that. You have to look to the loan agreement. No, I have looked to the loan agreement. The loan agreement applies default interest rates to the debtor, which is global energy, for as long as the event of default continues. But H1 is not the debtor. H1 in fact assumes the role of the lender under the subordination agreement. They assume the debt and the responsibilities with respect to the debt, and it's the loan agreement which defines what that debt is. They assume the responsibilities of the lender with respect to the debt. So they have to pay the outstanding indebtedness as of the date of default to American Green Fuels. And then they step into the shoes of American Green Fuels, and then it's their job to collect from global energy. And maybe then they could force global energy to pay the 25% default rate because they're the debtor, whatever. But I don't see any provision here that says the 25% default rate applies to the subordinated creditor. Your Honor, the subordination agreement does not define the responsibilities for payment at all other than you assume what's in the financing documents. And then you look to those. Well, the subordination agreement is the only thing that H1 signs, right? Global energy is the party to the loan agreement, right? So H1's duties are defined by the subordination agreement. No. Well, respectfully, no, they're not. The subordination agreement makes clear you assume the financing documents and the responsibilities of the debtor under them to pay the loan. But not the responsibilities of the debtor, right? The lender assigns the financing documents to the subordinated creditor, right, in exchange for cash consideration in the amount of the outstanding indebtedness. And then H1 becomes the lender, right? Yeah, but this all presupposes they pay. They didn't pay. No, I get it, but there's nothing in the subordination agreement that says if the subordinated creditor refuses to accept assignment of the financing documents, there's some penalty or there's some interest rate. It doesn't say anything about what happens in that event. Again, that's because that's not what defines what the responsibilities are after default and an assumption of the loan. It's the loan agreement which does that. You have to look to the provisions of the loan agreement. The loan agreement only applies to the debtor, which is global energy, and H1, which is assuming as of the date of default the obligations of the lender. We nevertheless should understand the loan agreement to somehow put the penalty rate that applies to the debtor onto the subordinated creditor. Absolutely. And is there a provision of the contract that says that? That's just how the loan agreement works. I mean if you assume the responsibilities of the debtor as defined in the loan agreement. But there is no provision of the subordination agreement that says you will assume the responsibilities of the debtor. It says you will take assignment of the financing documents from the lender in exchange for cash consideration and the amount of the outstanding indebtedness as of the date of default. Your Honor, they have to assume the obligations of payment as defined in the loan agreement. This is getting at the same place. Can you point us to the language of whatever agreement you think binds your opponent that supports your argument? Just point us to a page in the appendix. What is the language that supports your argument? Because that's what we're talking about, right? We're talking about written contracts. So rather than talking in the abstract, just point us to a page and a paragraph. Sure. It's a subordination agreement. What page are we looking at? JA-1123. And at the bottom of paragraph 8-2, it says, The subordinated creditor will assume and agrees it is obligated to assume the financing documents from the lender, and the lender agrees it will assign them to the subordinated creditor in exchange for cash consideration and the amount of the outstanding indebtedness pursuant to the loan document. Right, but so that's what I'm saying. So earlier in the very same paragraph, the term outstanding indebtedness is defined, right, at the beginning of 8-2, and it says the outstanding amount of the indebtedness under the financing documents as of such date, meaning the date in which the notice of default is sent, and that's the definition of outstanding indebtedness, right? Well, outstanding indebtedness takes you to the loan agreement. Well, in order to determine what the indebtedness under the financing documents is, you have to consult the loan agreement. Correct. But the term outstanding indebtedness is defined right there in that paragraph, right? It's the outstanding indebtedness under the financing documents. So what does the as of date mean? Because I think what you're saying is as of the date that the money is eventually collected? Because it says as of the day of the default, right? There's a default. Right. So you're saying it can change and increase after the day of the default? A different interest rate applies after the default. There's a 12% rate before a default. So you're saying they assume more than the outstanding indebtedness? Not if they paid right away. No, I didn't ask that. You're saying that if they don't pay, they assume the outstanding indebtedness and other things. No, what I'm saying is the outstanding – So hang on. Is the 25% year view part of the term outstanding indebtedness or is it something external to that that they also assume by virtue of some other agreement? It becomes part of it by virtue of the loan agreement. It becomes part of the outstanding indebtedness? Yes. Then how do you deal with the as of the default date? Because that suggests that as of the default date, it has – it acquires a fixed quantity or a fixed quality, right? I read this as – But you're saying it varies. You're saying it increases over time. The interest rate changes – No, outstanding indebtedness is the term. Does that change over time? It can change by application of the default interest rate if it's not paid. All right, thank you. I think we have your argument. Mr. Hagan, if you would like two minutes for rebuttal, we'll try to keep it tight to two minutes. Yes. Maybe if you want to address this last issue because it didn't come up on your opening. Sure, Your Honor. You got it exactly right. The outstanding indebtedness, the breaches of the subordination agreement, the refusal to assume the documents, that number is then set in time. They cannot be rewarded more than they would have had the contract been fully performed. Of course, you get post-judgment interest. That's a separate issue, and we deal with that in our contract. But you don't dispute that there is post-judgment interest. So if you've refused to pay the outstanding indebtedness that you agreed to pay as of that date, they do get post-judgment interest based on the New York statutory rate. From the time of the breach of the subordination agreement, you're absolutely right. I just want to briefly say they take a lot of focus on what we've called the deed of trust. But again, it's more than that. It includes a security agreement. And it's true, it does apply Tennessee law, but it's not just real estate law. And I implore the court to read from Joint Appendix 1188, Sections 4.01 and 4.02, where it specifically creates a security agreement under the UCC, defining UCC collateral and giving AGF all the remedies of a secured party under the code. So within the deed of trust, which again is really four agreements rolled in one, not just one agreement, it creates a security interest under Article 9. And why did they, Your Honor, you asked them why did they label it as both? Because I believe the contracts require them to. They have to foreclose on the deed of trust, and they have to conduct a UCC sale or in conjunction. They could do them both and satisfy them both. But without advertising to the public that this was a UCC sale, what would be the evidence that they own the machinery? Well, the machinery is part of the deed of trust estate, right? The deed of trust says it's all of the land together with all the state rights and interests of the trustor in and to all tangible property now owned or hereafter acquired by the trustor, including all machinery, apparatus, equipment, materials, supplies, fittings, articles of personal property, and so on. Sure. And if that's all it said, I think we may be in a different fact pattern, but the reality is here. Under 4.01 and 4.02, the parties agreed and created an Article 9 situation. Right, so 4.01 says this deed of trust constitutes a security agreement on personal property within the meaning of the Uniform Commercial Code, another applicable law. That's what you're talking about, right? Correct. And in fact that, you know, okay, so there's a security agreement on personal property under the UCC, but I think everybody seems to agree that if there were a sale only of the personal property, you would proceed under the UCC. And we're talking about what happens when you sell the land along with the personal property, and that is a sale of the deed of trust estate, and the deed of trust says that that should proceed under Tennessee law, right? Well, this is why I think this is an important case for this Court, is because the only way to read this that you don't get sort of a result that doesn't make any sense, as Your Honor pointed out, just the mere fact that you have, say, some piece of land underneath a very valuable plan, the parties can debate about the value, but now the process is entirely different. Under our view, they have to comply with both. If you create an Article 9 security agreement and a deed of trust as to the land, you have to comply with both. It's not that hard to do. You can do it as part of one process, but you can't render the security agreement the parties agree to under Article 9 meaningless. This and the separate security agreement, which is at Joint Appendix 1143. So you agree that the personal property is both subject to a security agreement on personal property within the meaning of the UCC, and it also is part of the deed of trust estate, right? Yes. Together with the land. That's all part of one document, and it's labeled as the deed of trust, I believe, assignment of rents, and then also a security agreement. So in principle, it's possible that maybe to reconcile the apparent tension between the sort of two definitions of the interest in the personal property, it might matter whether you're proceeding only with respect to personal property or you're proceeding with respect to the deed of trust estate as a whole. Yeah, and the other point I want to mention, Your Honor, is the lower court did not even grapple with these issues. She simply stated, the district court simply stated that they proceed under the deed of trust and that's under Tennessee law, not specifying whether that's a UCC or real estate or both. There's no analysis in the district court on this very, I think, thorny issue as we've debated today. Okay. All right, we have your arguments. Thank you both very much. We will take the case under advisement.